SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**NICOLE M. BOCKLEMAN, OSB #105934**
Assistant United States Attorney
Nicole.Bockelman@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**CHRISTOPHER HERMENS,**

**Defendant.**

**3:25-CR-00319-001-AN**

**GOVERNMENT'S SENTENCING MEMORANDUM**

## INTRODUCTION

Defendant's case stems from an undercover ATF investigation that focused on interrupting the source of significant quantities of fentanyl and methamphetamine coming from members of the Varrio Catorce Norteño street gang. Utilizing an undercover agent, ATF made deals with defendant to purchase firearms or controlled substances from defendant on four separate occasions. A search of defendant's residence revealed 19 firearms, including a rifle under his bed and a pistol on the floor next to his room.

Defendant is a leader of the Varrio Catorce Norteño gang with multiple connections to high-level fentanyl and methamphetamine dealers and sold controlled substances and firearms on multiple occasions. The facts of the instant offense combined with defendant's role in drugs sales throughout the community support the parties' joint recommendation of 120 months prison followed by 3 years of supervised release. It is the government's position that 120 months' imprisonment imposes consequences for defendant's gang leadership, his firearms sales and his controlled substance distribution; this Court should impose the jointly recommended 120-month prison term.

## **FACTUAL BACKGROUND**

### A. The Offense Conduct

In July of 2023, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began their investigation into Norteño and Varrio Catorce members in the Salem, Oregon area. Investigators learned that defendant, a known Varrio Catorce member, was on parole for robbery and was communicating about selling firearms and controlled substances.

**January 14, 2025**

An undercover agent with ATF (UC1) began communicating with defendant and they arranged purchases of controlled substances and firearms. On January 14, 2025, UC1 and defendant arranged a sale of cocaine and marijuana where UC1 placed an order for a half pound of marijuana and an ounce of cocaine. Defendant and UC1 agreed to meet at the Peppermill Pub in Beaverton, Oregon for defendant's sale of the marijuana and cocaine. UC1 met defendant inside the bar and explained to defendant that the marijuana would be taken to New York City for sale. Defendant gave UC1 a sample of the marijuana and discussed the sale of cocaine with UC1.

UC1 and defendant left the bar and walked to defendant's car. Defendant and UC1 entered defendant's car and defendant reached behind the driver's seat and pulled out two clear plastic bags containing 1.2 pounds of marijuana. While giving the marijuana to UC1, defendant explained that one of the bags was not as high quality of the other bag and explained, "we have damn near 1,000 pounds of that shit, we had like 960 packs last time we checked, we can't sell it out here". Defendant handed UC1 a baggie of 35 grams of cocaine. Defendant explained, "none of our stuff is cut too, when I get my shit, they test the whole brick with the tester strip". UC1 paid $1,400 to defendant, who counted the cash.

While UC1 was in defendant's car, defendant removed a black handgun from his waistband and described it as a P80 Ghost Glock while placing it on the center console. Defendant told UC1 that he would consider going to Kansas to sell his marijuana and that he would be "Call of Duty strapped up". UC1 told defendant that UC1 was interested in purchasing firearms and defendant said, "me and my homies, we buy everything we can." UC1 explained to defendant that UC1 resold guns to felons and defendant explained, "I can get 'em for $300 to $400, I got a white boy who makes them". Defendant explained that he can place orders for up to 10-15 guns and that the firearms would not have serial numbers. Defendant stated that he had a safe full of 9mm ammunition.

UC1 looked at defendant's firearm and asked defendant about defendant's ability to get "switches", or machine gun conversion devices. Defendant told UC1 that defendant knew someone who could get switches and that defendant could contact that person.

UC1 told defendant that UC1 would contact defendant to arrange future firearms purchases. Defendant told UC1 that defendant knew people that could purchase firearms from Federal Firearm Licensees in Salem. Defendant said he could obtain AR style rifles. Defendant

explained that he had a photo of a firearm that had been used by another Norteño member in a gang-related shooting. Defendant explained that he and another Norteño gang member had been driving in Portland, Oregon and saw a Sureño gang member. Defendant said that while they were stopped at a red light, defendant's fellow gang member exited the car and shot at the Sureños' vehicle, hitting the hood and windshield. Defendant explained, "my hood is in Salem, Varrio Catorce, I be there all the time." At the end of the deal, defendant told UC1 that he had access to an AR rifle and agreed to sell it to UC1 in the future.

**January 23, 2025**

On January 23, 2025, UC1 and defendant communicated through text messages and UC1 requested to purchase two ghost guns. Defendant sent UC1 a series of photos of firearms and they discussed prices. Defendant directed UC1 to initially meet him at the LA Fitness parking lot in Tualatin, Oregon, but later changed the deal location due to police vehicles being in the parking lot of the LA Fitness.

Defendant directed UC1 to meet him at the Batteries Plus parking lot. UC1 arrived at the meet location and saw that defendant was in a vehicle with two known Norteno Members as well as another individual, Carlos Rodney. When UC1 arrived, Defendant and the other three men exited the car. Two of the men walked away from the vehicle while defendant and Carlos Rodney walked to the trunk. Carlos Rodney removed a box from the trunk of his vehicle and set the box in the back seat of his car and sat in the back seat while defendant sat in the driver's seat.

UC1 entered Rodney's car through the front passenger door and Rodney handed him the carboard box and a plastic bag which contained four pistols, magazines for the pistols and an AR-15 magazine. UC1 asked if the guns had been fired and Rodney replied, "yeah, I already shot them all, I always clean them before". UC1 told Rodney and Hermens that the people UC1

sold guns to may commit crimes with the guns and asked if he should shave off the serial numbers from the firearms. Rodney answered, “It’s your call”.

UC1 showed Rodney the money he had for the purchase and asked if they could finish the sale in the undercover vehicle (UCV). Rodney and Hermens agreed and they walked to the UCV with UC1. UC1 counted $4,500 in cash and handed the money to Rodney. Once the gun sale was complete, UC1 and Rodney walked back to Rodney’s car and UC1 sat in the front passenger seat, Rodney sat behind UC1 and defendant sat in the driver’s seat. Defendant put a bag of cocaine on a scale on the center console.

UC1 counted $660 in cash and handed it to the defendant. Defendant handed UC1 the bag of cocaine that weighed 32 grams and tested presumptively positive. During the sale, defendant had an AR-15 style firearm next to his leg. UC1 offered to purchase defendant’s firearm, but defendant declined, saying, “I finally just got everything on it, I got the 60 at home, yeah, I fucking love this thing”. UC1 asked about buying guns from defendant and Rodney in the future, and Rodney stated, “yeah, we’ll keep it rolling”.

Before UC1 stepped out of Rodney’s vehicle, defendant offered to sell UC1 sex workers, stating, “I got two white bitches, they go together. Five hundred an hour for a threesome. I’ll slide you pictures”. UC1 asked defendant about purchasing fentanyl, and defendant said he could sell fentanyl for $900 to $1,000 per ounce. As a result of the deal on January 23, 2025, UC1 purchased five firearms and an ounce of cocaine from defendant and Carlos Rodney.

**<u>February 6, 2026</u>**

On February 6, 2025, UC1 and defendant communicated through text messages and defendant agreed to sell two pounds of marijuana and two firearms to UC1. Defendant directed UC1 and another undercover agent, UC2, to meet him at the Peppermill Pub in Beaverton,

Oregon for the deal. Defendant arrived at the pub and saw police vehicles in the parking lot of the pub and told UC1 to meet him in the parking lot of the Baskin Robbins in Beaverton, Oregon. UC1 and UC2 went to the Baskin Robbins parking lot and saw defendant arrive with Josiah Rios-Arroyo. Defendant was in the driver's seat and Rios-Arroyo was in the back passenger's seat. UC1 arrived and shook hands with defendant and Rios-Arroyo and defendant invited UC1 into his car. UC1 entered the front passenger seat and Rios Arroyo used his cellphone flashlight to show UC1 the marijuana.

Defendant told UC1 that the guns were inside the shoe box under the marijuana. UC1 asked if the weight was two pounds and Rios-Arroyo confirmed, "it's a little more". Defendant explained, "it's like two and…". UC1 asked if it was the same marijuana that he previously purchased and defendant said, "nah, this one's different" and Rios-Arroyo explained, "that shit good though".

UC1 opened the shoe box and saw two firearms. UC1 asked if the guns were hot and defendant and Rios-Arroyo shook their heads indicating "no". Defendant told UC1 that the .380 had a "beam" on it and UC1 gave defendant $2,850 in cash. Defendant started to count the cash and then handed it to Rios-Arroyo, who also started to count the cash.

During the sale of marijuana and firearms, UC1 told defendant that UC2 wanted to buy fentanyl. Defendant responded, "with the fetty…I could get a lot, bro. I can get them right now. I'm out, my plug has some." Defendant asked UC1 how much fentanyl UC2 wanted to buy and UC2 requested a zip (one ounce) as a sample.

Defendant took his cellphone and said, "Call Robert", and the UCs heard the phone ring. UC1 asked defendant what he meant when defendant mentioned, "licks". Defendant told UC1 that he had crews that would "go hit shit, like kick doors or whatever the fuck, go in there, grab

it". UC1 asked defendant if his crew was stealing money and defendant answered, "anything, hella packs, fucking hella fetty, coke, money, whatever, straps, you know I take what you got".

Defendant continued to attempt to contact his fentanyl source (Roberto Ochoa-Vergara). Eventually defendant was successful and spoke with Ochoa-Vergara. Defendant asked, "yo, you got a zip of fetty, you got a zip right now? Beaverton? Be 12 It's fire". Defendant told the UC agents that one ounce of fentanyl would be $1,200 and a half an ounce would be $700. The UC agents agreed to purchase one ounce of fentanyl from defendant and his source of supply, who defendant said was, "Rob".

Defendant told the UC agents to follow him to a Walgreens store in Beaverton, Oregon. The UC agents followed defendant as he drove to the Walgreens parking lot, and a short time later, Roberto Ochoa-Vergara arrived. Defendant went to Ochoa-Vergara's vehicle, entered the car and then exited shortly after entering. Defendant sold UC2 32 grams of fentanyl for $1,200. During the sale, defendant referred to the fentanyl saying, "this is fire…every single person saying this is the best shit I ever had, kept coming back".

**February 27, 2025**

Defendant and UC1 continued to communicate through calls and text messages. They agreed to meet on February 27, 2025 at Maxwell's Pub in Beaverton, Oregon for a fentanyl sale. UC1 and UC2 went to Maxwell's Pub and saw defendant and a female arrive at the parking lot. A short time later, Roberto Ochoa-Vergara arrived and introduced himself to the UC agents as "Rob". Ochoa-Vergara arrived with two other men who appeared to be acting as surveillance. Ochoa-Vergara walked to defendant, whispered in defendant's hear and then walked to the trunk of Ochoa-Vergara's car. Defendant looked at UC1 and asked, "you wanna go get it right now?" while nodding at Ochoa-Vergara. Ochoa-Vergara began discussing prices and quantities of

fentanyl with the UC agents. Ochoa-Vergara showed the UC agents a safe in the trunk of his car, which held half a kilogram of fentanyl stamped with "Versace" and several prepackaged bags of fentanyl and a bag with approximately 1,000 fentanyl pills. Ochoa-Vergara told the UC agents that he could get any quantity of fentanyl that they wanted, and explained he had 2-3 kilograms of fentanyl powder and between 3 and 4 thousand fentanyl pills available for sale. The UC agents asked Ochoa-Vergara how much a kilogram of fentanyl would cost and Ochoa-Vergara told them a kilogram would be $22,000.

The UC agents asked to purchase 5 ounces of fentanyl and asked about the price of 5 ounces. Ochoa-Vergara explained that he normally charged $1,250 per ounce, but that he would offer $1,000 per ounce. As he weighed the packages of fentanyl for the UC agents, he said, "I appreciate fucking Peanut (defendant) for, you know, making this happen, I've been telling him for a while, like, you know, this is what's in right now". Ochoa-Vergara handed the UC agents a bag with 122 grams of fentanyl and the agents paid him $5,000.



**March 18, 2025**

Defendant continued to communicate and meet with the UC agents and discussed fentanyl and firearm sales. On March 18, 2025, defendant and the UC agents agreed to meet to discuss a potential robbery of cocaine from a stash house operated by a Mexico based Drug Trafficking Organization (DTO). Defendant told the UC agents he wanted to complete the robbery in April and bragged about how he could kill any DTO members at the stash house. Defendant also boasted about being in high-speed chases, saying that he had been in chases with his vehicle going 150 miles per hour.

**March 19, 2025**

On March 19, 2025, defendant was stopped by Beaverton police while speeding at 114 miles per hour on Highway 26. Defendant eluded police, until he crashed his car and attempted to flee on foot. Defendant was caught with 85.7 grams of fentanyl on his person.

On July 22, 2025, law enforcement executed a search warrant of defendant's home. When defendant was placed under arrest, he was wearing a gold chain with a Huelga bird pendant with engravings of "Norte" and "V" and "C". The Huelga bird has been adopted by Norteno gang members as a sign of the gang. During the search, law enforcement found 19 firearms total. A rifle was found in defendant's bedroom under his bed, and a pistol was found in another bedroom on the floor next to defendant's bedroom. Inside the safe located in the garage, law enforcement found 17 firearms including two P80 pistol frames in a wooden box with a glass pipe that smelled of marijuana. Defendant's mother confirmed the box from the safe belonged to defendant.

**B. The Charge**

On July 7, 2026, defendant pleaded guilty to Count Four of the 12-count indictment. Count Four charged that on or about January 23, 2025, until February 6, 2025, in the District of Oregon, defendant intentionally shipped, transported, transferred, caused to be transported or otherwise disposed of the following firearms, to wit:

(1) A Sig Sauer pistol, model P320, 9mm, serial #M18-090789;

(2) A Glock pistol, model 48, 9mm serial #BFZD892;

(3) A Smith & Weston pistol, model M&P 45, serial # DUK9289;

(4) A Glock pistol, model 20, serial #BXML994;

(5) An IWI rifle, model Z-15, serial #Z0024539;

(6) A Smith & Wesson pistol, model M&P Bodyguard, serial #KHY7297; and

(7) A Glock pistol, model 27, serial number obliterated;

To another person in or otherwise affecting interstate commerce, having reasonable cause to believe use, carrying, or possession of a firearm by the recipient would constitute a felony as defined in 18 U.S.C. § 932(a); in violation of 18 U.S.C. § 933(a)(1). PSR at ¶1.

**C. Guidelines Calculations**

The Pre-Sentence Report (PSR) determined defendant's base level to be 22 under USSG § 2K2.1(a)(3), and his total offense level to be 35 after all adjustments. PSR at ¶78. When the parties calculated defendant's base offense level, we believed that defendant was a base offense level 20 because we did not account for the large capacity magazine located at defendant's residence. Likewise, the parties applied a two-level enhancement under USSG §2K2.1(b)(1)(B), rather than the four level enhancement applied in the PSR. At the time of calculation, the parties believed defendant's criminal history category to be III. The parties calculated the total offense

level of defendant to be 30 after all adjustments. Total offense level 30 with a criminal history category of III is a guideline range of 121-151 months prison. The government has no dispute the with the PSR calculations.

**D. Felony Criminal History**

| Crime | Conviction Date | Jurisdiction | Sentence |
|---|---|---|---|
| Driving under the influence of intoxicants; (DUII) (misdemeanor);<br>Reckless Driving (misdemeanor)<br>(Age 17) | 11/16/2015 | Washington County, OR | 1 year diversion (completed Count 1 dismissed); 12 months bench probation |
| Attempted Robbery I with a Firearm (felony); Robbery II (felony)<br>(Age 18) | 08/04/2017 | Washington County, OR | 70 months prison; 3 years post prison supervision |
| Theft III (misdemeanor)<br>(Age 24) | 03/03/2025 | Washington County, OR | 18 months bench probation |
| Possession of a Firearm by a Person convicted of a felony (felony)<br>(Age 24) | 12/22/2023 | Yolo County Superior Court, CA | 2 years prison; 3 years supervision |

The total criminal history score for the above criminal history is 8 and defendant committed the instant offense while under a criminal justice sentence; therefore, one additional point is added under USSG § 4A1.1(e) for a criminal history score of 9. The corresponding Criminal History Category is IV. PSR at ¶ 85-87.

**E. Government's Recommended Sentence**

The parties jointly recommend 120 months prison followed by three years of supervised release. The government makes this recommendation for three fundamental reasons: (1) defendant is a leader in the Varrio Catorce Norteño gang and was a primary actor in multiple sales of controlled substances and firearms; (2) defendant presents a significant danger to the

community through his controlled substance and firearm sales; (3) defendant's repeated failures in custody and while on supervision demonstrate that 120 months' prison is necessary to deter defendant from future criminal behavior and to protect the community.

From the beginning of this investigation, defendant held himself out as a leader and coordinator of the Varrio Catorce gang. He proudly explained to UC agents his ability to access and sell firearms, cocaine, fentanyl in addition to arranging and participating in human trafficking and armed robbery. Defendant's gang related activities were not limited to his words; he repeatedly demonstrated his ability to coordinate and organize controlled substance and firearms sales.

Defendant demonstrated a clear ability to connect supply and demand for firearms and drug trafficking. On January 14, 2025, the first time defendant met with UC1, defendant met with the UC agent alone. On that date, he sold 35 grams of cocaine and 1.2 pounds of marijuana. Defendant opened the dialogue of his ability to secure firearms and explained that he had access to many different types of guns, including "ghost Glocks". While the drug transaction was taking place, defendant showed UC1 that defendant was armed, taking the black pistol from his waistband and offering to sell UC1 firearms in the future.

Defendant's first sale set the stage for the next three sales that took place between defendant and the UC agents. In his second sale on January 23, 2025, defendant demonstrated his leadership and coordination skills in planning and finalizing the deal between himself, acting with Carlos Rodney, and the UC agent for the sale of five guns and 32 ounces of cocaine. During this deal, defendant explained his access to sex workers and fentanyl, paving the way for future fentanyl deals.

In his third sale with UC agents on February 6, 2025, defendant utilized his connections throughout the Varrio Catorce gang, and brought 18-year-old Josiah Rios-Arroyo to assist in facilitating a deal of marijuana and firearms. During this deal, defendant demonstrated his level of sophistication in his illicit drug and firearms trafficking by deliberately avoiding locations that he believed law enforcement could be present. Defendant instructed the UC agents on where to meet him, and changed locations in order to avoid law enforcement detection. Ultimately, defendant played an integral part in the sales of two firearms, 32 grams of fentanyl powder and 2.4 pounds of marijuana with an 18-year-old Varrio Catorce gang member.

Finally, in his fourth buy on February 27, 2025, defendant served as the conduit that resulted in the sale of 128 grams of fentanyl to UC agents. Once again, defendant using his leadership and connections, coordinated and directed the fentanyl deal between Ochoa-Vergara and UC agents that would not have been possible without defendant.

From the beginning, defendant demonstrated his level of leadership and coordination in connecting supply and demand for controlled substances and firearms. Defendant directed his fellow gang members on where to go for the deals, was present to facilitate in the deals, and supplied the firearms and drugs directly on some occasions. Defendant's access to very dangerous drugs including fentanyl and his sophistication in the manner of his sales highlight the importance of imposing consequences for his behavior and protecting the community.

Defendant demonstrates through his prior conduct while in custody that he struggles with following the rules and directives imposed on him. From January 2018 to May 2023, defendant was found to have committed 33 institutional rule violations. PSR at 82. These violations were for offenses ranging from Disobedience (five instances) to Assault I (six instances) and Staff Assault (two instances). Defendant's sanctions included disciplinary segregations, loss of

privileges, fines restitution and confiscated contraband. In one violation, defendant was found to have conspired with other inmates to plan the assault of another inmate; in another violation defendant, unprovoked, sprinted at another inmate and repeated punched and hit him while the inmate attempted to cover his head and body.

It is important to note that when defendant was released from prison on May 26, 2023, he committed a new crime less than three months after his release, when on August 16, 2023, he was cited for Theft in the Third Degree. Most recently, defendant was released from prison on August 22, 2024 and was arrested in the underlying case less than a year later on July 22, 2025, while defendant was still on supervision.

Defendant's repeated refusals to comply with rules while in custody and his poor performance while on supervision show the court that 120 months prison is necessary to afford adequate deterrence to defendant's criminal conduct, prior imposition of lesser sentences with probation have not resonated with defendant. The government recommends a prison sentence of 120 months followed by three years of supervised release because this is a sentence that is sufficient but not greater than necessary to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. *Dean v. United States,* 137 S. Ct. 1170, 1175 (2017); 18 U.S.C. §3553(a).

The nature and circumstances of the underlying offense demonstrate to the court that defendant should not be granted any benefit beyond the reductions already provided. Defendant's conduct of selling firearms and repeatedly selling cocaine and fentanyl to undercover agents demonstrates a disregard for public safety and he should be held accountable for his actions. The recommended 120-month prison term followed by three years' supervised release should be imposed.

**F. Forfeiture**

As part of his plea agreement, defendant agreed to forfeit all right, title, and interest in and to all assets which are subject to forfeiture pursuant to 18 U.S.C. § 924(d), 28 U.S.C. § 2461(c), 18 U.S.C. § 934(a)(1)(A), and 18 U.S.C. § 934(a)(1)(B) including the items listed in the Bill of Particulars filed in this case under ECF 49.

**CONCLUSION**

Based on the foregoing, the parties urge that this Court impose the jointly recommended 120-month prison sentence, followed by three years' supervised release, subject to the standard conditions, plus the special conditions that have been recommended in the PSR, and imposition of a $100 fee assessment.

Dated: October 28, 2026.

Respectfully submitted,

SCOTT BRADFORD
United States Attorney

*/s/ Nicole M. Bockelman*
NICOLE M. BOCKELMAN, OSB #105934
Assistant United States Attorneys